326 F.2d 673
 117 U.S.App.D.C. 130, 52 P.U.R.3d 497
 Joseph J. KESSLER, t/a WBXM Broadcasting Company, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Thomas C. FLEET, Jr., et al., d/b/a Fleet Enterprises, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, WFLI, Inc., Intervenor.
Robert A. JONES, et al., d/b/a McHenry County Broadcasting
Company, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
DUPAGE COUNTY BROADCASTING, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
PORTAGE BROADCASTING CORPORATION, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Frederick ECKARDT, d/b/a Mansfield Broadcasting Company, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
CAPE CANAVERAL BROADCASTERS, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
GOOD MUSIC BROADCASTING COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Reuben B. KNIGHT, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee.
Reuben B. KNIGHT, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
CAPE CANAVERAL BROADCASTERS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
GOOD MUSIC BROADCASTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
DUPAGE COUNTY BROADCASTING, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Thomas C. FLEET, Jr., et al., d/b/a Fleet Enterprises, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Robert A. JONES, et al., d/b/a McHenry County Broadcasting
Company, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
PORTAGE BROADCASTING CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
Frederick ECKARDT, d/b/a Mansfield Broadcasting Company, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents.
 Nos. 17363, 17369, 17379, 17415, 17420, 17421, 17423-17425,
17474, 17477-17483.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 29, 1963.
Decided Dec. 20, 1963.
 
 Mr. Joseph J. Kessler, appellant pro se, in No. 17,363.
 Mr. Lauren A. Colby, Owego, N.Y., for appellants in Nos. 17,369, 17,379 and 17,415 and petitioners in Nos. 17,479, 17,480 and 17,481.
 Mr. John H. Midlen, Washington, D.C., with whom Messrs. Byron E. Harrison and Donald K. Smith were on the brief, for appellant in No. 17,420 and petitioner in No. 17,482.
 Mr. Robert F. Jones, Washington, D.C., for appellant in No. 17,421 and petitioner in No. 17,483.
 Mr. John P. Bankson, Jr., Washington, D.C., with whom Messrs. Neville Miller and John B. Kenkel, Washington, D.C., were on the brief, for appellant in No. 17,423 and petitioner in No. 17,477, and with whom Messrs. Arthur H. Schroeder and John B. Kenkel, Washington, D.C., were on the brief, for appellant in No. 17,424 and petitioner in No. 17,478.
 Mr. Stanley S. Neustadt, Washington, D.C., with whom Mr. Leonard H. Marks, Washington, D.C., was on the brief, for appellant in No. 17,425 and petitioner in No. 17,474. Mr. Paul Dobin, Washington, D.C., also entered an appearance for appellant in No. 17,425.
 Mr. Daniel R. Ohlbaum, Associate General Counsel, Federal Communications Commission, with whom Messrs. Max D. Paglin, General Counsel, and Ernest O. Eisenberg, Counsel, Federal Communications Commission, were on the brief for appellee-respondent Federal Communications Commission. Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, also entered an appearance for appellee-respondent Federal Communications Commission.
 Mr. Michael I. Miller, Attorney, Department of Justice, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Mr. Lionel Kestenbaum, Attorney, Department of Justice, was on the brief, for respondent United States of America.
 Mr. Eugene F. Mullin, Jr., Washington, D.C., for intervenor WFLI, Inc.
 Messrs. J. Parker Connor and S. White Rhyne, Jr., Washington, D.C., also entered appearances for intervenor WFLI, Inc.
 Before BAZELON, Chief Judge, and WASHINGTON and BASTIAN, Circuit judges
 WASHINGTON, Circuit Judge.
 
 
 1
 These cases challenge the action of the Federal Communications Commission in imposing a 'freeze' on the acceptance of applications for most classes of standard radio broadcast stations, pending the adoption of new rules on the subject.
 
 I.
 
 2
 The 'freeze' was announced by the Commission in a Report and Order issued on May 10, 1962, effective at the close of business on that day. The Order said, among other things, that the Commission intends 'to issue a notice of proposed rule making' relating to possible revision of its rules governing AM broadcast assignments, which 'are virtually unchanged from those adopted two decades ago.' The Commission pointed out that 'Between 1945 and 1962, the number of authorized standard broadcast stations has grown from 955 to 3,871, and the fact of this tremendous growth coupled with the particular way in which the growth has occurred, has created problems[1] which differ greatly from those anticipated when the present standard broadcast rules were adopted,' and that an immediate reexamination of the standards employed in assigning new or changed standard broadcasting facilities was required.[2] The first step necessary for this reexamination, the order said, was a partial halt in the Commission's acceptance of standard broadcast applications. It was said, however, that procedural fairness required that the processing of applications currently on file be completed, although this processing must take into account and seek to avoid unnecessary aggravation of the problems mentioned. The Commission stated that it would also continue to accept for filing certain applications which 'would not frustrate the ends we seek to achieve by our re-study, or for which there are strong public interest considerations weighing in favor of acceptance.' It exempted from the 'freeze' (a) applications 'which would bring service to 'white' areas and which would cause no interference to existing stations'; (b) applications for new Class II-A facilities 'since, in the Clear Channel Proceeding, we have determined that these new assignments would serve the public interest'; and (c) most applications for Class IV power increases.[3]
 
 
 3
 The Commission said that since its Order related 'to matters of practice and procedure before the Commission, proposed rule making in accordance with the provisions of Section 4 of the Administrative Procedure Act is not required.' Commissioner Hyde dissented, saying 'this is essentially a substantive policy decision and ought to be the subject of a public notice before decision.'
 
 
 4
 Subsequent to the date of the Order each of the appellants tendered to the Commission applications for standard broadcast facilities, petitions requesting reconsideration of the freeze, and petitions requesting waiver of the freeze.
 
 
 5
 On October 15, 1962, the Commission released a Memorandum Opinion and Order, deciding that its action in imposing the May 10th freeze was not unlawful, that it would not modify or waive in any case the interim criteria established for the filing of new applications, and that all applications not consistent with the interim criteria would be returned to the applicants.
 
 
 6
 Following release of this Opinion and Order and return of their applications, appellants sought review in this court.[4] The parties have stipulated the questions presented to us, and we now consider them.
 
 II.
 
 7
 The first question to be decided, as stipulated, is whether the Commission's freeze order of May 10, 1962, constitutes 'a substantive rather than a procedural rule change, and if so, was the Commission required to give notice and/or follow the public rule making procedure prescribed by Sections 3 and 4 of the Administrative Procedure Act, 5 U.S.C. 1002 and 1003?'
 
 
 8
 We first consider Section 4 of the Act, 60 Stat. 238-239 (1946), 5 U.S.C. 1003, which provides insofar as here pertinent:
 
 
 9
 '(a) Notice; publication and contents
 
 
 10
 'General notice of proposed rule making shall be published in the Federal Register * * * and shall include (1) a statement of the time, place, and nature of public rule making proceedings * * *. Except where notice or hearing is required by statute, this subsection shall not apply to interpretative rules, general statements of policy, rules of agency organization, procedure, or practice, or in any situation in which the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest. ' (b) Procedures
 
 
 11
 'After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner * * *.'[5]
 
 
 12
 Admittedly the procedure specified by this section was not followed by the Commission with respect to the May freeze order: it issued the freeze order summarily without prior notice and hearing. As already noted, the Commission, with one member dissenting, said in the order that the Section 4 procedure was not required, because the interim procedures established relate to 'matters of practice and procedure before the Commission.' The October Memorandum Opinion and Order explained this conclusion as follows:
 
 
 13
 'Substantive rules are those which change standards of station assignments and procedural rules are those dealing with the method of operation utilized by the Commission in the dispatch of its business. * * * The determinative factor is the context within which the rule was promulgated and, flowing from this context, the essential purpose of the rule. Viewing the interim criteria in terms of these factors, it is clear that the purpose of the 'freeze' was not the establishment of new allocation standards without public participation in rule making but, to the contrary, the creation of conditions under which formal rule making proceedings can be held in an effective, efficient, and meaningful manner. In the Report and Order adopting the interim criteria, we noted explicitly that the deteriorating situation in standard broadcast allocations would require a formal rule making proceeding. We also recognized, however, that such a rule making proceeding, possibly of extended duration, could have little meaning if we continued to allocate new stations under the old rules, thus intensifying the very problems our rule making sought to remedy. In this specific context, the Commission concluded that a temporary limited halt in the acceptance of standard broadcast applications was a necessary adjunct to any efficient and effective rule making. We believe the manner in which we chose to meet anticipated problems surrounding our rule making proceeding represented a necessary and proper exercise of our discretion in this area. (Citing Ranger v. Federal Communications Commission, 111 U.S.App.D.C. 44, 294 F.2d 240 (1961)) Since the interim criteria created no new station assignment standards but were, rather, primarily concerned with the effective functioning of Commission processes, the AM 'freeze' was procedural in nature and not subject to the formal rule making requirements of the Administrative Procedure Act.'
 
 
 14
 We agree. As the Order made clear, its purpose was to impose a temporary halt on the filing of new applications pending the consideration, and possible promulgation, of new rules following notice and a public hearing. The Commission's action amounted to a temporary suspension of filing procedures within the Commission, with three exceptions, until the outmoded and unsatisfactory old rules could be reexamined in a proceeding which would conform with the requirements of public notice and hearing, and in which possible amendments to the rules might be made.
 
 
 15
 It is argued to us that insofar as the order excepted from the freeze on filing three classes of applications, it created new standards of a substantive nature. But applications accepted for filing as falling in one of the three excepted classes are not automatically granted. And it seems plain that any applications filed in the three classes will be judged by existing technical and other standards. There is nothing in the order to suggest otherwise. In any case, the Commission excepted the three types of application from the freeze because this action 'would not frustrate the ends we seek to achieve by our re-study, or for which there are strong public interest considerations weighing in favor of acceptance.' The reasons given with respect to each class-- because in one case it would bring recognized needed service to unserved areas, in another case it would serve the public interest as already determined in the Clear Channel proceedings, and in the third case it was necessary to preserve the effectiveness of the Class IV power increase plan-- indicate clearly that all the exceptions were deemed to be required in the public interest.[6] We think the essential purpose and effect of the freeze order was not to create new rules,[7] but to provide an effective interim procedure controlling the time and order in which applications were to be considered under the existing rules pending conclusion of the rule making proceeding.
 
 
 16
 We are advised that the rule making proceeding is currently in progress. We of course cannot predict the content of the rules which may ultimately be adopted, and we certainly will not assume that any of the appellants will be ineligible to have applications considered under the new rules or that they will be unable to meet the requirements which may be fixed by the new rules in respect of applications. The effect, if any, of the new rules on the applications of these appellants remains for the future.
 
 
 17
 In Mesa Microwave, Inc. v. Federal Communications Commission, 105 U.S.App.D.C. 1, 262 F.2d 723 (1958), and Harvey Radio Laboratories, Inc. v. United States, 110 U.S.App.D.C. 81, 289 F.2d 458 (1961), we declined to upset freezes on the granting and the processing of pending applications for certain television licenses and certain radio frequencies, which had been imposed by the Commission without prior notice and hearing, pending completion of a public 'inquiry' proceeding in the Mesa case and of a rule making proceeding (the Clear Channel proceeding) in the Harvey case. We said in the Harvey case in language very pertinent here (supra, 110 U.S.App.D.C. at 83, 289 F.2d at 460):
 
 
 18
 'The Clear Channel proceeding contemplates the possibility of a fundamental realignment of radio stations on the clear channel frequencies. Accordingly, 'piecemeal' consideration of requests for individual locations on these frequencies might well prejudice the ultimate allocation and defeat the purposes of the program. And the effort invested in a determination of individual proposals might be rendered futile by a contrary disposition of the rule making proceeding-- thus producing even more delay. * * *'
 
 
 19
 Clearly, if the Commission may validly impose, without prior notice and a Section 4 hearing, freezes on the consideration and granting of applications already on file pending the completion of proceedings to make new rules, it must follow that a freeze on the filing of applications is also not a violation of Section 4 of the Act. In Ranger v. Federal Communications Commission, 111 U.S.App.D.C. 44, 294 F.2d 240 (1961), we held that the Commission could validly amend its regulations as to the cut-off date for the filing of new applications in a comparative proceeding without formal rule making procedures, since the action effected only procedural changes. We said:
 
 
 20
 'Of course all procedural requirements may and do occasionally affect substantive rights, but this possibility does not make a procedural regulation a substantive one.' Supra, 111 U.S.App.D.C. at 48, 294 F.2d at 244.
 
 
 21
 In the circumstances we think that the temporary freeze on the acceptance of applications was correctly viewed by the Commission as a matter of procedure and practice before it and that it was not a substantive rule, requiring the advance notice and public participation specified by Section 4 of the Administrative Procedure Act.[8]
 
 
 22
 The question as stipulated also requires a decision as to whether Section 3 of the Administrative Procedure Act was violated. That section provides, insofar as here pertinent:
 
 
 23
 '(a) Every agency shall separately state and currently publish in the Federal Register * * * (2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available * * *. No person shall in any manner be required to resort to * * * procedure not so published.' 5 U.S.C. 1002.
 
 
 24
 The Commission does not dispute that it was required to publish the May freeze order in the Federal Register under this section. The Report and Order was filed for publication with the National Archives on May 15, 1962, at 8:45 a. m., pursuant to Section 2 of the Federal Register Act, 44 U.S.C. 302, and it was published in the Register on May 16, 1962. The requirement of the section was thereby met. Questions relating to its effect on the two appellants seeking to file an application after May 10, the day the order was adopted, and before May 15, will be considered in Part V, infra.
 
 III.
 
 25
 The question is also posed as to whether the Commission's action violated the alleged 'doctrine' of Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), that broadcasting is to be left in the area of free competition.
 
 
 26
 We do not read the Sanders case as enunciating such a broad doctrine. The actual holding was-- see 309 U.S. at 473, 60 S.Ct. at 696-- that economic injury to a rival station resulting from competition is not an element which the Commission must weigh independently, apart from the public interest element, in passing on an application for a license. In connection with this holding, the Court said that the Communications Act 'recognizes that the field of broadcasting is one of free competition' (309 U.S. p. 474, 60 S.Ct. p. 697), that the policy of the Act is clear that no one given a license 'is to have anything in the nature of a property right,' that its purpose is not 'to protect a licensee against competition but to protect the public' (309 U.S. p. 475, 60 S.Ct. p. 697), and (309 U.S. pp. 475-476, 60 S.Ct. p. 698):
 
 
 27
 'This is not to say that the question of competition between a proposed station and one operating under an existing license is to be entirely disregarded by the Commission * * *. It may have a vital and important bearing upon the ability of the applicant adequately to serve his public; it may indicate that both stations-- the existing and the proposed-- will go under, with the result that a portion of the listening public will be left without adequate service; it may indicate that, by a division of the field, both stations will be compelled to render inadequate service.'
 
 
 28
 The freeze order in this case specifically stated that originally, in formulating rules in the standard broadcast field, the Commission had three goals: to give a local outlet to communities of substantial size, to provide competing stations in communities with a facility, and to eliminate 'white' (unserved) areas in certain sections of the country; that the first two objectives had been fulfilled to an unexpected degree, but the 'white' areas had not been significantly reduced and other problems had appeared; that accordingly, reexamination of the rules was required and that a rule making proceeding would be instituted. The order obviously was deemed to be in the public interest; and we so view it. The order contains nothing to suggest that the freeze on filing of new applications was imposed to eliminate or restrict competition, or that the concept of competition as it relates to the public interest will be eliminated from consideration in the rule making proceeding. As already pointed out, we cannot forecase the content of the rules to be adopted, if any, and we will not assume that any of them will prevent any of the appellants from filing applications or will circumscribe competition where it is in the public interest to have it. As the Sanders case makes plain, appellants can claim no unlimited right to compete, independent of considerations of public interest.
 
 IV.
 
 29
 Several questions are put to us on the general issue of whether the Commission acted arbitrarily and capriciously, assuming that the action was otherwise lawful, in imposing the freeze.
 
 
 30
 1. It is claimed that it was arbitrary to return the appellants' applications without giving appellants the hearing provided by Section 309 of the Communications Act of 1934. That section provides in material part:
 
 
 31
 '(a) Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies,[9] whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.
 
 
 32
 '(e) If, in the case of any application to which subsection (a) of this section applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest * * *.' 47 U.S.C. 309(a) and (e) (Supp. IV, 1959-1962).
 
 
 33
 It will be noted that a hearing under Section 309 is given in terms only with respect to 'each application filed with' the Commission, where the Commission is unable to grant the application summarily by finding it to be in the public interest. The appellants here have tendered applications, knowing in advance of doing so that, for a temporary period pending conclusion of the rule making proceeding, new applications would not be accepted for filing, unless they fell within one of the three excepted classes of application. And having tendered an application that was not within one of the three exceptions, the application was returned and was not filed.
 
 
 34
 The Commission made no formal finding in terms, apart from its statements with respect to the three excepted classes, that the general freeze was in the public interest. It said that the freeze 'is essential so that we may avoid compounding present difficulties with a continual flow of new assignments based upon existing, possibly inadequate, standards.' We think this does effectively show the public interest in the imposition of the general freeze, apart from the three excepted classes. But in any case the record would not lead us to conclude that the public interest would in fact be served by ordering the immediate filing and hearing of the appellants' applications.
 
 
 35
 We think that where an application is not accepted for filing because of a temporary freeze on filing adopted by the Commission, which is properly determined to be in the public interest, the right to a hearing under the terms of Section 309(e) of the Communications Act has not materialized. Cf. KFAB Broadcasting Co. v. Federal Communications Commission, 85 U.S.App.D.C. 160, 177 F.2d 40 (1949). There is nothing to warrant a conclusion that hearings called for by Section 309 will not be granted when the freeze is lifted, with respect to applications then filed. We are unable to find arbitrary and capricious action in this respect.[10]
 
 
 36
 2. Was it arbitrary and capricious to fail to give advance notice of the freeze?
 
 
 37
 We think not. To have given advance notice would have brought, prior to the cut-off date fixed in the notice, a flow of new applications, all to be decided upon existing and possibly inadequate standards, as the Commission pointed out in the order announcing the freeze. And in the October Memorandum Opinion, quoted above in Part II, the Commission stated that a temporary and limited halt in the acceptance of applications was a necessary adjunct to effective rule making. It said also it believed the method it chose to meet the problems presented was a necessary and proper exercise of its discretion. Further along in the opinion the Commission explained:
 
 
 38
 '* * * it became necessary to determine the nature and extent of the 'freeze' necessary to accomplish our objectives. Upon an analysis of all pending applications, we concluded that the total number of potential grants that could result from proposals on file (excluding Class IV power increases), was not sufficiently great to frustrate the ends we sought to accomplish through our rule making. We decided, therefore, that we could continue to process applications on file, recognizing the equitable considerations inherent in those cases, without substantial sacrifice of our basic objectives. At the same time, however, we recognized that any further acceptance of new applications would raise the number of grants to an intolerable level and, accordingly, it was concluded that we must exercise our administrative discretion so as to bar such new applications. It was further concluded that if a freeze were to be put into effect it must be done without delay since, on the basis of past experience, it was expected that any substantial postponement would result in a flood of several hundred hastily prepared applications. Therefore, we amended our procedural rules to establish, in effect, a new 'cut-off date' for most pending applications, this new date acting to supersede all previous cut-off lists.'
 
 
 39
 We can only conclude that an immediate freeze on new applications, other than those specifically excepted, was a reasonable means of assuring that the objectives of the contemplated rule making proceeding would not be frustrated. The reasons given by the Commission for the immediate freeze on new applications were based on its past experience. We have little basis indeed for holding that the freeze was imposed arbitrarily and capriciously. In Federal Broadcasting System v. Federal Communications Commission, 96 U.S.App.D.C. 260, 265-267, 225 F.2d 560, 565-567, cert. denied sub nom. WHEC, Inc. v. Federal Broadcasting System, 350 U.S. 923, 76 S.Ct. 212, 100 L.Ed. 808 (1955), we said that the Commission's action in accelerating the hearing of two non-conflicting applications for a single channel, and thereby cutting off the application opportunity of a potential applicant who had no notice of the acceleration, was not invalid and was not arbitrary in the sense that it violated due process. We added, supra, 96 U.S.App.D.C. at 269, 225 F.2d at 567:
 
 
 40
 'Here the exceptional treatment accorded to the Rochester applications was proposed to be granted to 47 other television applications, in an effort by the Commission to speed up the disposition of applications where a contest had ceased to exist. The Commission's approach to the problem of disposing of this backlog of uncontested television applications certainly cannot be considered as equivalent to a single arbitrary exception in the handling of pending applications. The Commission is not bound to adhere to a procedure just because it was once adopted.'
 
 
 41
 We realize that some of the appellants have incurred substantial expense in preparing applications which cannot be filed until the freeze is lifted. But we will not ignore the public interest and conclude that the Commission's action is arbitrary with respect to them because of this. It is our view, however, that if, following conclusion of the rule making proceedings, any of the appellants file under the new rules, the Commission should be at liberty to give their applications a measure of priority, giving weight to the time of tendering the present applications, subject to such reasonable conditions as the Commission may impose.[11] The grievances asserted before us would thus be alleviated to some extent.
 
 
 42
 [13,14] 3. Was the Commission's refusal to file the applications of appeallants or to waive the freeze as to their applications arbitrary and capricious in light of its considering and granting other applications?
 
 
 43
 As has already been sufficiently noted, the Commission adequately explained its reasons for processing applications on file prior to the freeze and for taking new applications of three classes, specifically excepted from the freeze for reasons of public interest-- reasons we believe to be well within the Commission's discretion and expertise.
 
 
 44
 We cannot accept the view that the Commission could have avoided arbitrariness only by freezing consideration of all applications, including those pending, a step which it generally appears to have taken in the past. The issue is not what we might have done ourselves or what we might think would have been more reasonable. The issue is whether what the Commission did, in the light of the reasons it gave, was unreasonable and capricious. And we cannot conclude that it was. We will not overturn as unreasonable the Commission's judgment that the public interest requires that the three exceptions to the filing of new applications be made. We have already noted that only four applications within the succeeding ten months period were actually filed thereunder. Nor do we dispute the Commission's judgment in this instance that equitable considerations required or at least justified the processing of pending applications where an analysis showed that they involved potential grants not so numerous as to frustrate the ends sought in the rule making proceeding. We are unwilling to say that it did not lie within the Commission's discretion and expertise to make this choice, in the case of applications already before it. See Coastal Bend Television Co. v. Federal Communications Commission, 98 U.S.App.D.C. 251, 234 F.2d 686 (1956), where we sustained the Commission in refusing to freeze new television grants pending a possible change in the rules.
 
 
 45
 4. Those appellants who claim that their applications would be mutually exclusive with applications already on file stand, however, in a different position, in our judgment, if their factual claims in this respect are well founded. The Commission explained in its Memorandum Opinion and Order its reasons for declining to file their applications, as follows:
 
 
 46
 '* * * these petitioners argue (that) the total number of possible grants would not be increased. This argument is not borne out by the facts. The petitioners advancing this particular argument have failed to consider the inevitable development of 'chains' of interlinking mutually exclusive proposals. The chain problem is far from a fanciful possibility, a fact which must be acknowledged by anyone familiar with recent hearing proceedings involving groups of twenty or more applications spread over wide areas of the country, linked together by interference considerations. The following examples are illustrative of the type of problem to be anticipated if we were to accept new applications 'mutually exclusive' with proposals already on file.[12] The examples given * * * have been reduced to their simplest terms for purposes of illustration. In practice, it is to be expected that these problems would often occur in combination and attain considerable complexity. Confronted with these possibilities, and having decided that we will continue to process applications filed prior to May 10, 1962, the Commission concludes that the only reasonable and effective means of accomplishing our objectives is to bar all applications tendered after May 10th which are not consistent with the interim criteria.'
 
 
 47
 We of course cannot dispute the Commission's judgment that to allow mutually exclusive applications to be filed would increase the possibility of lengthy and complex hearings on proposals linked with others by interference considerations and create the possibility of additional hearings and multiple grants as shown in the examples given. But to recognize that lengthy, and perhaps more numerous, hearings may be the result does not, we think, justify without more the refusal of an Ashbacker hearing, see Ashbacker Radio Corp. v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), to those applicants who tendered to the Commission an application mutually exclusive with one already on file and to those whose applications have now or may become mutually exclusive with others.
 
 
 48
 In response to an order to show cause issued by us with respect to this point, the Commission has advised us that, pending our resolution of these appeals, the Commission will refrain from granting any application filed before May 11, 1962, 'where a substantial allegation of mutual exclusivity is raised by an applicant or would-be applicant.' The Commission also states that although it has granted, designated for hearing, or cut-off by publication of a list, many applications filed prior to May 11, 1962, it has not granted any application filed before May 11, 1962, with which the application of any of these appellants is mutually exclusive. The Commission noted that in making this statement it was not abandoning its position that the Ashbacker doctrine does not require a reversal as to the appellants because that case confers a procedural right only upon otherwise timely filed applications. The Commission conceded that the appellants filed applications which were timely except for the freeze.
 
 
 49
 We have concluded that those appellants who tendered applications which are, or become, in fact mutually exclusive with an application pending on May 11, 1962, or one accepted for filing since that date, are entitled to participate in a comparative hearing on that application under the Ashbacker case-- if any grant is to be made-- and that the Commission may not deprive them of this right when their applications were timely but were rejected only because of a temporary freeze on accepting new applications. The substantial effect of a contrary view would be not only to freeze the acceptance for filing of a timely application but to freeze new applicants permanently out of a right of substance-- the comparative hearing on the pending application to which they are entitled when their application is timely. This would be not only contrary to the aim of the freeze as announced by the Commission, but does not seem to us warranted by anything the Commission said as to the possible increased complexity of such a hearing or the possible increase in number of hearings or grants. We hardly need add that if a grant of a pending application is to be considered under existing standards, the public interest would demand that mutually exclusive applications timely tendered be also considered in a comparative hearing designed to ascertain the applicant best qualified to provide the broadcasting service involved. The Commission will of course exercise its judgment as to whether mutual exclusivity does in fact exist in the case of any applicant claiming it, as to whether it wishes to waive the freeze on acceptance of applications from applicants claiming mutual exclusivity, and as to whether it wishes to proceed with the comparative hearing in due course, or simply to postpone such hearing pending conclusion of the rule making and the filing thereafter of new applications by appellants and others.
 
 
 50
 In view of our conclusion it becomes unnecessary to decide whether it was arbitrary and capricious to erase the previously fixed cut-off date for further applications mutually exclusive with those on the cut-off list by imposing an earlier freeze on acceptance of new applications.[13] It is also unnecessary to decide whether or not it was error not to accept the applications of those appellants who allege that their applications would be mutually exclusive with a pending application, without making findings of fact and conclusions of law as to certain disputed points.
 
 
 51
 5. We cannot conclude that the Commission acted arbitrarily and capriciously in declining to reconsider or waive the freeze as to any of the appellants.[14] Until the rule making proceedings are concluded and new standards, if there are to be any, for allocation of stations are crystallized, the question of whether the granting of a particular application of one of the appellants would serve the public interest under those standards can hardly be determined. As the Commission stated:
 
 
 52
 '* * * insofar as the requests are based upon a public need, we feel it necessary to delay fulfillment of that need in individual cases so that a better overall plan for assigning standard broadcast stations in the public interest may be devised.'
 
 
 53
 We think that the Commission correctly treated the public interest in rule making as overriding temporarily a particular community's need for the proposed standard broadcast service, and that the appellants have not shown adequate reasons for reconsideration or waiver of the freeze as to them. Cf. United States v. Storer Broadcasting Co., 351 U.S. 192, 205, 76 S.Ct. 763, 100 L.Ed. 1081 (1955).
 
 V.
 
 54
 was the freeze order effective with respect to applications tendered by appellants Portage Broadcasting Corporation and Fleet Enterprises to the Commission for filing on May 14, after the order was adopted on May 10 but before it was filed for publication on May 15, and before it was published in the Federal Register on May 16? The appellants contend, relying principally on Section 3(a) of the Administrative Procedure Act, that the order did not become effective as to them.
 
 
 55
 The Commission pointed out in its Memorandum Opinion that on May 10 at 3 p.m. it made available for distribution the complete text of the Report and Order relating to the freeze, adopted on that day, together with a public notice summarizing the Report and Order and quoting verbatim the operative sections of the interim criteria, and that each application tendered after May 10 and prior to May 15--
 
 
 56
 'carries with it some written indication that the applicant, the applicant's attorney, or both, had read at least the public notice prior to the time the application was tendered for filing.'
 
 
 57
 Nothing in the record would warrant us in overturning the finding that the petitioners had actual knowledge of the contents of the order.[15]
 
 
 58
 As already noted in Part I, the Commission conceded that it was required by Section 3(a) of the Administrative Procedure Act, supra Part II, to publish the freeze order in the Federal Register,[16] and it followed the procedure provided by Section 2 of the Federal Register Act, 49 Stat. 500 (1935), 44 U.S.C. 302, for such publication.[17] Section 7 of the Federal Register Act, 49 Stat. 502 (1935), 44 U.S.C. 307, provides that--
 
 
 59
 'No document required under section 5(a) (of this Act) to be published in the Federal Register (see footnote 16, supra) shall be valid as against any person who has not had actual knowledge thereof until the duplicate originals or certified copies of the document shall have been filed with the Division and a copy made available for public inspection as provided in section 2 (of this Act) * * *.'We think this section is applicable to the procedural order involved here, the publication of which is required by Section 3(a) of the Administrative Procedure Act and consequently by Section 5 of the Federal Register Act. See footnote 16, supra. We conclude further that the petitioners are bound by the actual knowledge they had of the freeze order, including knowledge of its effective date, and that they are not privileged to claim that it was ineffective as to them because their applications were tendered before the document was filed for publication. This seems plain from the language of Section 7 of the Federal Register Act, quoted above. See United States v. Aarons, 310 F.2d 341, 346 (2d Cir. 1962). As Judge Friendly, speaking for the court in that case, pointed out (p. 348), the legislative materials indicate that the actual knowledge rule of Section 7 of the Federal Register Act is applicable for purposes of Section 3(a) of the Administrative Procedure Act, and that a person having actual notice of a procedural rule change is bound by it, even though it has not then been published. See Legis.Hist. APA 408, 415. We agree with the Second Circuit's views in the Aarons case on this point-- though we add that both the Aarons and Hotch[18] cases were criminal cases, requiring a strict interpretation of the statutory provisions. The present situation is one which would ordinarily require a less strict construction of the notice statute than one in which a criminal prosecution is involved.
 
 
 60
 Further, Section 3(a) does not provide in terms that a procedural rule will be ineffective until it is published. The only sanction provided in the section is that 'No person shall in any manner be required to resort to organization or procedure not so published.' In Federal Broadcasting System v. Federal Communications Commission, 96 U.S.App.D.C. 260, 267-268, 225 F.2d 560, 567-568, cert. denied sub nom. WHEC, Inc. v. Federal Broadcasting System, 350 U.S. 923, 76 S.Ct. 212, 100 L.Ed. 108 (1955), we sustained the Commission's decision to accelerate its processing procedures to the detriment of a potential applicant who had no notice of this decision, and said that 'Appellant was not compelled to resort to procedure not published.' Similarly, the freeze order here did not require any procedural action on appellants' part. It was simply an announcement of a freeze on the further filing of applications pending completion of rule making proceedings. S.Rep.No.752, 79th Cong., 1st Sess., published at Legis.Hist. APA 187-217, stated (at p. 198): 'The requirement that no one shall' in any maner 'be required to resort to unpublished organization or procedure protects the public from being required to pursue remedies that are not generally known.'[19] Certainly this purpose is not thwarted by the application of an unpublished rule which temporarily suspends the opportunity to file an application-- and particularly where the person unable to file under the rule had actual knowledge of his inability.
 
 
 61
 The Commission's freeze order will be affirmed generally for the reasons given. The cases on appeal will, however, be remanded to the Commission with instructions to proceed in a manner not inconsistent with this opinion.
 
 
 62
 So ordered.
 
 
 
 [1]
 The Commission explained that most communities of 10,000 or more now have local outlets and that--
 'lack of competition in the standard broadcast band can no longer be regarded as a serious problem. At the same time, this tremendous proliferation of stations has occurred without significant reduction of 'white' (unserved) areas. The outlying areas which lacked primary service in 1946 have been reduced only a minute degree by the continual flow of new assignments. More than this, concentration upon the creation of multistation markets has led to a derogation of engineering standards, so that service rendered by existing stations in the outermost regions of their normally protected service areas has been impaired, future power increases to extend the interference-free contour over growing suburban populations are often rendered impossible, and the available channels for the establishment of new stations in growing underserved areas have been continually reduced in number.'
 
 
 [2]
 As the Commission stated:
 'First, certain of the technical rules, entirely adequate when adopted, have lost their practical validity as the number of stations has grown. * * *
 'Second, and of greater importance, is the fact that, owing to intense concentration upon providing local outlets and competitive services, many of the most crucial standards have been impaired by built-in exceptions and by waivers.'
 
 
 [3]
 Inclusion of such applications was explained as follows:
 'Approximately 500 authorizations to increase the power of Class IV stations to one kilowatt have been granted to date, and, since the effectiveness of the general plan allowing Class IV power increases is dependent upon all such stations (except those restricted by international considerations) increasing power, it is essential that we continue to accept applications from those stations which have not yet increased power and which are, in many cases, suffering substantial interference from those Class IV stations which have been granted increases.'
 
 
 [4]
 Review was sought by all but one of the appellants by petition for review under Section 402(a) and by appeal under Section 402(b)(1) of the Communications Act. Appellant Kessler (No. 17,363) sought review by appeal only under Section 402(b)(1). The United States argues that all seek review of the non-acceptance of their applications for filing because of the freeze order, that all are claiming that this in effect denies their applications, and that they may have review of this only under Section 402(b)(1). None of the appellants has submitted any argument to the contrary. We agree with the position of the United States, and think that we may exercise our power to review in these cases only under Section 402(b). Our review here will be understood as proceeding under that section only. The petitions under Section 402(a) will be dismissed. Cf. Functional Music, Inc. v. Federal Communications Commission, 107 U.S.App.D.C. 34, 274 F.2d 543 (1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959); Tomah-Mauston Broadcasting Co. v. Federal Communications Commission, 113 U.S.App.D.C. 204, 306 F.2d 811 (1962)
 
 
 [5]
 Subsection (c) states that: 'The required publication or service of any substantive rule * * * shall be made not less than thirty days prior to the effective date thereof except as otherwise provided by the agency upon good cause found and published with the rule.'
 
 
 [6]
 We are told that during the ten months after the freeze was imposed, only four applications were accepted for filing as coming within the three exceptions to the freeze
 
 
 [7]
 Even if we were to assume arguendo that the exceptions made on a temporary basis, pending reconsideration of the rules, themselves amount to new substantive rules, we think the Commission adequately stated its findings and reasons as to public interest so as to fall within the spirit if not the letter of the exception in Section 4(a) of the Administrative Procedure Act
 
 
 [8]
 Questions as to whether it was unreasonable and arbitrary for the Commission to exempt from the freeze applications falling in specific classes will be considered in Part IV
 
 
 [9]
 Section 308 provides that the Commission may grant construction permits and station licenses only upon written application therefor received by it
 
 
 [10]
 Although the courts will rarely order the Commission to hold a hearing looking to the possible grant of a particular application, there may be circumstances where the length of the delay is so excessive or the reasons for the delay so arbitrary, that a hearing must be ordered to prevent substantial injustice. Compare Harvey Radio Laboratories, Inc. v. United States, 110 U.S.App.D.C. 81, 289 F.2d 458 (1961). See Section 10 of the Administrative Procedure Act, 5 U.S.C. 1009(e)(A). See, generally, Note, 72 Yale L.J. 574-589 (1963). In the instant case neither the length of the freeze nor the reasons for its imposition justify an exception to the general policy that the time of holding of hearings is a matter for the reasonable exercise of the Commission's discretion
 
 
 [11]
 All of the appellants tendered their applications for filing on or before June 15, 1962. In view of their claim that the freeze order was a substantive, rather than a procedural, order, they were on strong ground in believing that they were entitled to file their applications within 30 days after publication of the order. See Section 4(c) of the Administrative Procedure Act, quoted in footnote 5, supra. Although we have ruled against them as to the nature of the order, we think that in fairness they should be given the measure of priority we have outlined in the text
 
 
 [12]
 The examples given by the Commission are set out verbatim:
 '(a) A was on file prior to the freeze and B seeks to file an application after May 10, 1962, for a new facility in a different city but on the same frequency as A. Are A and B mutually exclusive? It is often impossible to determine, prior to hearing, whether two applications for different communities are 'mutually exclusive'. Many applications resulting in some degree of mutual interference are granted concurrently under our present rules. Thus, it may be impossible to predict, when B tenders his application, whether its acceptance would result in two grants rather than one.
 '(b) A was on file prior to the freeze. Prior to A's cut-off date, B and C file applications for stations on the same (or adjacent) frequency as A, but in different cities. B and C may prove to be 'mutually exclusive' with A but not with each other, again raising the possibility of multiple grants where one had been possible before.
 '(c) A and B, both on file before the freeze, propose mutually exclusive operations in different cities. C, filing after the freeze, proposes a new facility in A's city, but utilizes a different directional antenna pattern (or lower power) so that the C proposal is not mutually exclusive with B's. It is now possible to grant both C and B, rather than A or B. Thus, even though C has applied for a station in the same city as A, it is still possible to increase the number of potential grants.
 '(d) A, an applicant filing prior to the freeze, may not possess all requisite qualifications. Acceptance of B's application makes possible a new grant where there would have been none upon denial of A's application, even when B applies for facilities identical to those sought by A.'
 
 
 [13]
 It should also be noted that the equities of those who had a time limitation are not discernably greater than those of appellants who were properly rejected notwithstanding the absence of any time limitation
 
 
 [14]
 The reasons urged by the appellants were generally, as the Commission summarized them, that (1) they had invested substantial amounts of time and money in preparing applications, nearly completed when the freeze went into effect, and (2) that the tendered application proposed a much needed service for a particular community. The Commission stated that in deciding not to waive the freeze, it accepted 'the various factual allegations of petitioners (the appellants) as true.' We have already dealt with the point relating to the expenditure of time and money. Our discussion here will relate to the needed service point only
 
 
 [15]
 Appellant Fleet states that it and its counsel had received a copy of the Commission's public notice on May 10, but that they did not receive the actual text of the Report and Order until after the application was tendered. The receipt of the notice, which adequately summarized the Report and Order, charges Fleet in law with knowledge of the Order's contents. Appellant Portage tendered with its application on May 14 a petition for acceptance of the application for filing indicating that it had knowledge of the contents of the public notice and the Report and Order
 
 
 [16]
 Section 5(a) of the Federal Register Act, 49 Stat. 501 (1935), 44 U.S.C. 305, provides that there shall be published in the Register, inter alia, 'such documents or classes of documents as may be required so to be published by Act of the Congress.'
 
 
 [17]
 The Administrative Procedure Act contains nothing relating to the procedure to be followed in effecting publication, and it is clear that the Congress intended the provisions of the Federal Register Act to control. See Appendix to Attorney General's statement attached to the Senate Report on the Administrative Procedure Act, which states:
 'Section 3(a), by requiring publication of certain classes of information in the Federal Register, is not intended to repeal the Federal Register Act (44 U.S.C. 301 et seq.) but simply to require the publication of certain additional material.' Administrative Procedure Act, Legislative History, S.Doc. 248, 79th Cong.2d Sess. 225 (1946) (hereafter cited as Legis.Hist. APA.'
 
 
 [18]
 Hotch v. United States, 14 Alaska 594, 212 F.2d 280, (9th Cir. 1954). In the Aarons case the court expressly disagreed with the conclusion reached in Hotch v. United States
 
 
 [19]
 H.R.Rep. No. 1980, 79th Cong., 2d Sess., Legis.Hist. APA 235, 256, contains the same statement in almost identical language