John H. THOMAS and Oliver N. Kilgore, Plaintiffs,

v.

The COUNTY OFFICE COMMITTEE OF CAMERON COUNTY and the County Office Committee of Willacy County, Texas, Defendants.

Roy JONES et al., Plaintiffs,

v.

Rafael GUERRA et al., Defendants.

Civ. A. Nos. 71–B–25, 71–B–23.

United States District Court, S. D. Texas, Brownsville Division.

March 18, 1971.

Thomas G. Sharpe, Jr., Brownsville, Tex., for plaintiffs, John H. Thomas and Oliver N. Kilgore.

Garland F. Smith, Smith, McIlheran & Jenkins, Weslaco, Tex., and Neal King, Hill, King & White, Mission, Tex., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., William L. Bowers and Charles Wolfe, Asst. U. S. Attys., Houston, Tex., for defendants.

Morris Atlas, Atlas, Hall, Schwartz, Mills, Gurwitz & Bland, McAllen, Tex., Attys. for Intervenor Jones and others.

## MEMORANDUM AND ORDER

NOEL, Presiding Judge.

In these cases plaintiffs sue to enjoin actions of the Agricultural Stabilization and Conservation County Committees (hereafter County Office Committees) of Cameron, Willacy and Hidalgo Counties, Texas.[1] On March 5, 1971, the Court ordered that parties aggrieved by the decisions of the County Office Committees should exhaust their administrative remedies pursuant to the procedures enumerated in 7 U.S.C. § 1363 (1938) as amended (1951) before urging their claims in Federal Court. Pursuant to this Order the plaintiffs presented their complaints to the Agricultural Stabilization and Conservation Review Committee (hereafter Review Committee) having appellate jurisdiction over the County Office Committees in litigation here. *See:* 7 U.S.C. § 1363 (1938) as amended (1951); and 7 C.F.R. §§ 771.2–711.27 (1970) as authorized by 7 U.S.C. § 1375 (1938) as amended (1941). The Review Committee met on March 9, 1971, to review de novo the validity of the County Office Committees' determinations. That same day after hearing the argument of counsel and receiving the evidence, the Review Committee entered the following decision as its findings of fact and conclusions of law affirming the actions of the agencies below:

> The Review Committee convened to review the decisions of the County Committees of Cameron and Hidalgo Counties hereby unanimously found the following:

> There was a demand in Cameron County for the cotton acreage allotments which were the subject of applications for out of county transfer and therefore the decision of the Cameron County Committee not to permit out of

county transfers and to deny said applications was proper and that decision is affirmed.

> The Hidalgo County Committee properly found that there was no demand in Hidalgo County for cotton acreage allotments and therefore the decision of the Hidalgo County Committee to permit out of county transfers was proper and that decision is affirmed.

> /s/  Raymond Hindes
> Chairman
> Review Committee

> /s/  Harold H. Wakehouse
> Vice-Chairman
> Review Committee

> /s/  Richard P. Horton
> Member
> Review Committee

Unfortunately, the decision is couched in ultimate and conclusionary terms and fails to articulate the basic factual findings which the Review Committee had to make in order to reach its determinations. The decision also fails to enumerate the legal criteria which the Review Committee applied.

After examining the transcripts of the proceedings before the Review Committee, the Court is unable to determine the legal or factual basis of its decision. During the March 9, 1971 hearing counsel representing the contesting parties were unable to agree upon the meaning of the term "demand" and the factual determinations to be made by the Review Committee.

Since the Review Committee failed to enunciate the legal principles to which it applied the evidence adduced at the hearing and failed to divulge the basic factual determinations which it made, the Court is forced upon its own motion to remand the cases to the Review Committee. If this Court were to now attempt to review the propriety of this administrative decision, the Court would be called upon to speculate and to imply the basic facts and law which the

---

1. By agreement of the parties and the approval of the Court, the claim against

Willacy County was dismissed during the Court's March 11, 1971 hearing.

Review Committee used in reaching its determinations. This would be impermissible. Such speculation would in effect require the Court to engage in independent de novo fact finding. It is a basic maxim of federal administrative law that a Court reviewing an agency's determinations cannot engage in independent fact finding, but instead must limit its review to the ascertainment of whether the agency correctly applied the law, and the ascertainment of whether there is substantial evidence in the agency's record to support its factual determinations. Jones v. Hughes, 400 F.2d 585, 590 (8th Cir. 1968); Chandler v. David, 350 F.2d 669 (5th Cir. 1965); cert. denied 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Crolley v. Tatton, 249 F.2d 908, 910–912 (5th Cir. 1957); *see also:* Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Hayes v. Celebrezze, 311 F.2d 648 (5th Cir. 1963); Review Committee, etc., v. Willey, 275 F.2d 264, 273 (8th Cir. 1960); cert. denied 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed. 2d 1522 (1960). Therefore, if this Court were to engage in a review of the Review Committee's determinations, it would be exceeding the powers granted to it by the Congress. To cure this problem, the Review Committee is ordered to amend its decision within five (5) days by the addition of proper findings of fact and conclusions of law. Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Great Lakes Screw Corp. v. N.L.R.B., 409 F.2d 375, 378–380, 380 n. 4 (7th Cir. 1969); Austin v. Jackson, 353 F.2d 910, 912 (4th Cir. 1965); Lautares v. Smith, 285 F. Supp. 578, 583 (E.D.N.C.1968); Stallard v. Review Committee, 275 F.Supp.

931 (W.D.Va.1967); 7 C.F.R. §§ 711,21 (g), 711.23; 2 K.Davis, Administrative Law Treatise §§ 16.05; 16.06, 450; 16.07 (1958); *see also:* Crolley v. Tatton, 249 F.2d 908, 910–912 (5th Cir. 1957). The Court believes that it is appropriate to point out that the Review Committee is free to seek the assistance of all counsel as an aid to its formulation of its revised factual and legal determinations. *See:* Lautares v. Smith, supra. This is not, however, to be construed as an encroachment upon the Review Committee's power on remand, and the Committee is free to reach its revised decision in any manner it desires which is consistent with due process. *c. f.:* Crolley v. Tatton, supra; and Garvey v. Freeman, 397 F.2d 600 (10th Cir. 1968).

In order to facilitate the Review Committee's determinations the Court is of the view it should reiterate and expand upon its discussion of the term "demand" as used in Public Law 91–524 §§ 601(3) (1) (a) (1) and (2) (11/30/71) (hereafter called the Agricultural Act of 1970). As the Court stated on pages 3–7 of its March 5, 1971 Memorandum and Order:

Section 601(3) (1) (a) (2) requires that the County Office Committee approve the in-state out-of-county transfer of cotton acreage allotments unless they find that there exists a "demand" for the acreage allotments in the respective transferor county.[2] The Agricultural Act of 1970 does not define the term "demand" and no regulations have been promulgated by the Secretary or Department of Agriculture defining the test which the County Office Committees must use to ascertain if an in-county demand exists.[3] Since no other court

---

2. The Act states in pertinent part:
   Provided, that no farm allotment may be sold or based for transfer to a farm in another county unless the Agricultural Stabilization and Conservation Committee established pursuant to section 8(b) of the Soil Conservation and Domestic Allotment Act, as amended, for the county from which such transfers are being made (1) finds that the

*demand* for such acreage allotments no longer exists in such county and (2) approves any transfers of allotments to farms outside such county. (italics added). This footnote did not appear in the original text.)

3. Counsel informed the Court during the March 11, 1971 hearing that the Department of Agriculture had submitted a regulation to the Federal Register for

has defined this term as used in § 601, it is a question of first impression.

In an attempt to define the criteria implicit in the term "demand" as used in § 601, the Court examined the legislative history of the Act. This examination did not disclose any Congressional discussion of the term. The examination, however, did disclose that the 1970 Amendments to the Agricultural Act of 1938, as amended in 1965 and 1968, were the Congress' answers to the problems its previous enactments had caused to the cotton industry. Specifically, an examination of Congressional Committee reports and the comments of legislators and witnesses during committee hearings disclosed that Congress believed the prior law to have been too restrictive of native cotton production, and intended that the 1970 Amendments should cause an increase in the growth of domestic cotton. *See*: House Committee Report of the Agriculture Committee, 91–1329 (to accompany H.R. 18546) at 41 (7/23/70); Senate Committee Report of the Agricultural and Forestry Committee, 91–1154 (to accompany H.R. 18546) published in U.S.Cong. and Ad.News, at 6198–99 (8/28/70); Conference Committee Report (to accompany H.R. 18546) published in U.S.Cong. and Ad. News at 6213 (10/9/70); Senate Agricultural and Forestry Committee Hearings on H.R. 18546 at 433–445, 634–635, 637 (1970).

Because of this change in philosophy the regulations promulgated to facilitate the interpretation and use of the Agricultural Adjustment Act of 1938, 7 U.S.C. 1344 (1938) as amended in 1965 and 1968, are of no help in defining the scope and use of the term "demand" as used in the 1970 Agricultural Act § 601.

The Court, however, is not without the aid of the Secretary and Department of Agriculture's expertise on the scope of the term. Seven days (November 23, 1970) before the Act of 1970 was approved by the President, the Department of Agriculture distributed a handbook to the County Office Committees for their use in applying the new Act. The provisions of this handbook relevant to the determination of whether in-county demand existed were attached as exhibit

---

publication on March 10, 1971. No proof was or has been offered to demonstrate that the regulation was ever published as it must be to become official and binding. *Kessler v. F.C.C.*, [117 U.S.App. D.C. 130] 326 F.2d 673 (D.C.App.1963). The copy of the purported regulation submitted to the Court states:

7 CFR § 722.418 *Transfers by Sale or Lease Across County Lines.*

Transfers by sale or lease across county lines within the same state may be authorized by the county committee of the county from which the allotment is to be transferred if the committee (1) finds that a demand for such base acreage allotments no longer exists in such county, and (2) approves any transfers of base acreage allotments to farms outside such county. The county committee shall make a determination *whether transfers by sale or lease* may be made at the time the original notification of cotton base acreage allotments are mailed to farm operators each year. If the determination is not to permit transfers by sale or lease to other counties, the determination shall be reconsidered by the county committee on a date 30 days following the original determination (except that for 1971, the date for reconsideration shall be by February 1, 1971) or on such later date as may be approved by the Deputy Administrator. To the extent practicable, the county committee shall give general publication to determinations under this ection. In making its finding upon initial consideration and upon reconsideration whether a demand for base acreage allotments no longer exists in the county, the county committee should consider any factor reasonably related to such a demand. A stronger indication that such demand no longer exists would be (1) that a majority of the producers voting in the last transfers referendum voting to approve transfer from the county, or (2) *that relating acreage was surrendered* to the state committee in a recent year. This regulation, albeit official or not, will not change the Court's subsequent discussion of the law and has been considered in same. (This footnote was not in the original text.)

A to plaintiff's original complaint in C.A. 71–B–23.[4]

Since it is undisputed that the handbook was not published in the Federal Register [5] and therefore not promulgated according to the strict requirements of the Administrative Procedure Act's notice provisions, 5 U.S.C. § 552(a) (1) (1946) as amended (1966), it cannot be accorded the dignity of a regulation having in substance the dignity of legislation. U.S.A. v. Morton Salt Co., 338 U.S. 632, 644–645 [70 S.Ct. 357, 94 L.Ed. 401]; Graham v. Lawrimore, 185 F. Supp. 761 (E.D.S.C.1960); aff'd 287 F. 2d 207 (4th Cir. 1960); Hawkins v. State Ag. [Stabilization and] Con. Com., 149 F.Supp. 681, 687 (S.D.Tex.1957); aff'd 252 F.2d 570 (5th Cir. 1958). Since it does not constitute an official regulation of the Secretary or the Department of Agriculture, it is not binding upon the parties. *Id.*

The guidelines set out in the handbook are, however, to be accorded considerable weight by the Court in interpreting the meaning of § 601. In Skidmore v. Swift and Co., 322 [323] U.S. 134, 140 [65 S.Ct. 161, 89 L.Ed. 124] (1944), the Supreme Court discussed the value of agency pronouncements which did not have the *dignity of official regulations* of the agency. There the Court states:

> We consider the rulings, interpretations, and options of the administrator under this act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such judgments in a particular case will depend upon the thoroughness evident in its consideration, the validity

of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Id.*; In re Petition of Wong, 224 F.Supp. 155, 165 (S.D.N.Y.1963); Woods v. Benson Hotel Corp., 75 F.Supp. 743, 748 (D. Minn.1948); aff'd on other grounds; 168 F.2d 694 (8th Cir. 1948); vacated on other grounds; 81 F.Supp. 46 (D. Minn.1948).

Since the handbook was distributed only seven days before the Act was signed by the President and after both Houses of Congress had approved the Committee's Report, 1970 U.S.Cong. and Ad.News, p. 6164 (12/20/70), the Court must conclude that Congress was not aware or guided by the provisions of the handbook. The Court, however, is compelled to conclude that the Secretary and Department of Agriculture had time to examine the pending legislation and to lend their expertise to the task of drafting a handbook which in their judgment would consistently implement the Congressional intent inherent in the 1970 Agricultural Act.

The section of the handbook governing out-of-county in-state transfers of cotton allotments states:

§ 172  *Transfers out-of-county.*

A.  *Owner Transfers.* No restrictions on transfers across county lines.

B.  *Sale or Lease Transfers.* The COC shall determine whether to authorize out-of-county transfers.

1.  *Original Determination*
    a.  *Time of Original Determination.* By the date original allotment notices are mailed.

---

4. The factual information discussed here is derived in part from the statements of counsel during the February 25, 1971 pretrial conference. (This footnote was in the original text.)
   During the March 11, 1971 hearing plaintiffs' counsel in C.A. 71–B–25 introduced into evidence as Exhibit A a three-page excerpt from a later supplement for this handbook. These pages do not change

the tests for determining the existence of "demand" which the Department of Agriculture had placed in its earlier supplementation to the handbook. (This note was not in the original text.)

5. This information was disclosed to the Court by counsel during the February 25, 1971 pretrial conference. (This footnote was in the original text.)

b. *Basis for Approval.* A finding that acreage to be transferred is no longer need in the county should be made and out-of-county transfers approved:

(1) If, in the last transfer referendum, a simple majority of the producers voting authorized out-of-county transfers, or

(2) If, released acreage was surrendered to the STC in a prior year, or

(3) For any other reasonable basis. *Reconsideration of Original Disapproval.* Within 30 days after mailing the original notices, the COC shall reconsider their determination not to authorize out-of-county transfers. At this time the COC should assume that all producers within the county have acquired all the acreage they desire to obtain, thus the COC should authorize out-of-county transfers.

Examination of these sections shows that in the expert opinion of the Department and Secretary of Agriculture, the term "demand" used in § 601(3) (1) (a) (2) (1) of the Agricultural Act of 1970 does not allow a County Office Committee determining if "demand" for cotton allotments exists to consider, for example, the general economic conditions in the transferor or transferee county or the needs or demands of any persons or businesses in a particular county except the producers of cotton in the transferor county. The handbook makes it clear that in the opinion of the Department, which this Court shares, the Congress intended the term "demand" to create a test whereby the respective County Office Committees or Review Committees would limit their considerations and the facts to be considered by them to the determination of whether producers, otherwise entitled to additional cotton allotments, who reside in the transferor county desire to acquire the allotments sought to be transferred out of county.

The Court is now convinced that the only manner, consistent with the Con-gressional intent, by which this desire could be evidenced would be a determination by the County Office Committee of whether there was and had been an active market for the purchase and lease of the allotments on the day the Committee made its decision whether to allow the transfer of cotton allotments out of county.

The existence of such a market could reasonably be found if it were shown that the cotton producers of the county in which the Committee sat were and had been engaged in the leasing and/or purchasing and selling of cotton allotments to one another on and before the day the County Office Committee made its determinations. Other evidence tending to show the existence of a market demand for the cotton allotments would be a showing that cotton producers of the county in which the County Office Committee sat were presently engaged in negotiations concerning the transfer in county of allotments, and/or had recently been submitting the requisite forms to the County Office Committee requesting the approval for their proposed in-county allotment transfers. If, however, it were shown that the county cotton producers were no longer engaging in the negotiation and/or leasing and selling of cotton allotments to one another, regardless what the causes for the cessation, the County Office Committee could reasonably conclude that a demand no longer existed for the in-county transfer of the allotments. This Court is of the opinion Congress intended that the requisite demand for the allotments would not be demonstrated by a showing that county cotton producers desired to engage in the buying or leasing of allotments at some future date after the County Office Committee reached its decision. Instead, the evidence of demand would have to demonstrate that the county producers had manifested their acquisitive desires in conduct already cognizable to the County Office Committee at the time they made their determinations.

The Court is convinced that the Congress intended to exclude from the criteria it believed would demonstrate demand any showing that the cotton producers of the county wanted or needed to acquire surrendered acreage by reallocation. This exclusion is reasonable because it augments the Congressional intention to insure the fullest production of cotton. It assures the highest potential use of the allotments by producers at an earlier time in the crop year, thereby minimizing the chance that allotments might not be used after their surrender. This legislative pronouncement is not modified because the counties involved in this litigation have always reallocated all the surrendered allotments, and, in fact, have received additional allotments from the State Committee. Instead, this Court must ignore the local county crop histories and assume that the Congress took these into account when it promulgated legislation having national effect. As further evidence of this Congressional intent, it is important to note that the experts in the Department of Agriculture who drafted the relevant sections of the handbook and of the proposed regulation quoted above did not include in the suggested tests to be used for the ascertainment of "demand" any reference to the desire of in-county producers to acquire allotments by reallocation after the surrender deadline for that county's allotments. This omission leads to the inescapable conclusion that the experts in the Department of Agriculture agree with this Court's interpretation of the legislative intent made above.

The Court believes that the criteria enumerated in § 172 1(b) and (2) and § 172(2) of the handbook and in the proposed regulation should also be considered by the Review Committee when it makes its redeterminations. It is important to note, however, that even if the results of both the specific tests for demand enumerated in the Department of Agriculture's pronouncements discussed above were adverse to the results of other reasonable tests of demand, these specific tests would not be absolutely binding. Instead, the agency making the determination would be free to weigh the results of the different tests of demand it considered before making its decision.

Accordingly, it is further Ordered that the Review Committee consider this Memorandum and Order while proceeding administratively. They should note that this Court will give particular consideration to the effectuation of the intent of the Congress. The Clerk shall send copies of this instrument to counsel and to the Review Committee.