**AERONAUTICAL RADIO, INC., Air Transport Association of America, Aircraft Owners and Pilots Association, Braniff Airways, Incorporated, Heart O' Wisconsin Broadcasters, Inc., David Ingle, Jr., Lake Central Airlines, Inc., North Central Airlines, Inc., Northwest Airlines, Inc., United Air Lines, Inc., Petitioners,**

v.

**UNITED STATES of America and Federal Communications Commission, Respondents,**

American Trucking Associations, Inc., National Association of Broadcasters, American Merchant Marine Institute, Inc., American Radio Relay League, Incorporated, Intervenors.

No. 14419.

United States Court of Appeals Seventh Circuit.

July 10, 1964.

Donald C. Beelar, Washington, D. C., John C. Butler, Chicago, Ill., Owen M. Johnson, Jr., Chicago, Ill., James M. Johnstone, Washington, D. C., for petitioners, John S. Yodice, Washington, D. C., of counsel for Aircraft Owners and Pilots Assn., John E. Stephen, Washington, D. C., of counsel for Air Transport Assn. of America.

Lionel Kestenbaum, Dept. of Justice, Daniel R. Ohlbaum, Associate Gen. Counsel, Max D. Paglin, Gen. Counsel, Joel H. Levy, Counsel, F.C.C., Washington, D. C., William H. Orrick, Jr., Asst. Atty. Gen., George R. Kucik, Atty., Dept of Justice, Washington, D. C., for respondents.

Jeremiah Courtney, Arthur Blooston, Washington, D. C., for intervenor, American Trucking Assns., Inc.

Robert M. Booth, Jr., Washington, D. C., for intervenor, The American Radio Relay League, Inc.

Cornelius P. Coughlan, New York City, for intervenor, American Merchant Marine Institute, Inc.

Douglas A. Anello, Washington, D. C., for intervenor American Merchant Marine Institute, Inc.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

The issues raised by this joint petition to review [1] an order [2] of the Federal Communications Commission establishing a comprehensive schedule of license fees are: I. whether the Order is based on an unconstitutional and invalid delegation of legislative power; and II. whether, if constitutional, the power was exercised in such manner as to render the schedule void. We decide the issues in favor of the Commission.

The schedule under review was ordered by the Commission October 7, 1963, effective January 1, 1964,[3] prescribing fees for applications for licenses to use the public air waves for radio purposes. The Commission acted under authority of Title V of the Independent Authorization Act of 1952. 65 Stat. 290 (1951), 5 U.S.C. § 140. It is § 140, a rider to the Act, which is assailed as an unconstitutional grant of legislative power.

The substance of § 140 is a declaration of the "sense of the Congress that any * * * service, * * * license, * * * or similar thing of value * * * provided * * * by any Federal agency * * * except those engaged in the transaction of the official business of the Government, shall be self-sustaining to the full extent possible, and the head of each Federal Agency is authorized by regulation (which, * * * in the executive branch, shall be as uniform as practicable and subject to such policies as the President may prescribe) to prescribe * * * such fee * * * as he shall determine * * * to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts * *."

I.

Petitioners contend that § 140 is an unconstitutional delegation of legislative power because of a "combination" of factors: it was addressed to all agencies and not to a specific high-level administrator; the subject matter of the legislation belies the possibility of a basic policy determination by Congress; the agency head has the "uncontrolled option" whether or not to prescribe fees; and the standards set forth in the statute are not only diverse, but are so conflicting and inconsistent that they cannot be used to place limits on the administrative discretion. In our opinion none of these factors with regard to the statute before us constitutes an unconstitutional abdication of legislative power, and we do not see how their "combination" puts § 140 "beyond the pale of constitutionality" as petitioners contend.

The constitutional essentials for determining whether an act of Congress constitutes an invalid delegation of power are set forth in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). There the Supreme Court held constitutional the Emergency Price Control Act of 1942 which fixed prices during

---

1. Pursuant to § 402(a) of the Communications Act, as amended, 47 U.S.C. § 402(a), and the Judicial Review Act of 1950, 5 U.S.C. §§ 1031 et seq.

2. Petitioners seek review of a Report and Order of the Commission (28 Fed. Reg. 4658), issued May 6, 1963, establishing the schedule of filing fees, and a Memorandum Opinion and Order (28 Fed. Reg. 10911), issued October 7, 1963, effecting several changes in the fee sched-

ule in response to petitions for reconsideration.

3. This court, on December 31, 1963, granted a temporary injunction staying the effect of the Order. 5 U.S.C. § 1039(b). On February 13, 1964, the injunction was dissolved. The Commission began collecting fees, March 17, 1964, the moneys collected going to a special Treasury Fund established pursuant to this court's order dissolving the temporary injunction.

World War II. The Court found that Congress had stated the legislative objective, the method of achievement, and the guiding standards for the administrator. The guides were requirement of fairness and equity with due consideration "so far as practicable" to the prices prevailing in a designated base period. The Court said, "Only if we could say there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed would we be justified in overriding the choice of means for effecting the declared purpose." 321 U.S. at 426, 64 S.Ct. at 668.

■ The constitutional essentials are not absent here. The Congressional objective is that agencies issuing "license and the like" shall be self-sustaining "to the full extent possible." The method prescribed is fees "uniform as practicable." The guides are fairness and equity "taking into consideration direct and indirect cost to the Government, value to the recipient, [and] public policy or interest to be served." And in the proper proceeding this court can determine, as will be seen hereafter, that the Order is consistent with Congressional policy.

A reading of the Commission's Report and Order is sufficient to answer the claim that § 140 is too vague, and the criteria meaningless, as applied to petitioners and intervenors. Certainly the Commission could, without difficulty, know what Congress' goal was; the boundaries of the means to be used are plain and were, we think, applied by the Commission in a knowledgeable way. Yakus v. United States, 321 U.S. 414, 424, 64 S.Ct. 660 (1944). The standard of "fair and equitable" is a commonplace standard in our jurisprudence, and is sufficient in the area of the Commission's sphere of power as the standard of "public convenience and necessity" approved in FCC v. Pottsville Broadcast-

ing Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940), or the various instances mentioned in Yakus at pages 426–427 of 321 U.S. The Congressional ground rules are clear enough to limit the Commission, and, if more specific, Congress might have thought, would have been too narrow to embrace all federal agencies.

■ Because § 140 is merely permissive in nature, rather than mandatory, or contingent upon a prerequisite finding, does not mean that it is an unconstitutional abdication of legislative functions. In Panama Refining Co. v. Ryan, 293 U.S. 388, 415, 55 S.Ct. 241, 246, 79 L.Ed. 446 (1943), the Court invalidated § 9(c) of the NIRA because it delegated to the "President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he * * * [saw] fit * * * [with] disobedience to his order * * * a crime punishable by fine and imprisonment." It is true that in cases following Panama Refining, all upholding legislative delegation, Congress made prerequisite an administrative finding before the agency was empowered to use the delegated powers.[4]

■ We do not believe the lack of a specific prerequisite renders § 140, which is addressed to *all* federal agencies, each formed for a different purpose, fatally defective. The "self-sustaining" purpose of § 140 must be weighed against the purpose for which each of the many agencies was established. Therefore, as a prerequisite to a fee schedule, each agency must weigh the policy of making its services "self-sustaining" against the public policy considerations for which it was formed, and upon this determine whether or not to establish a fee schedule. This is what the FCC has stated it has done with respect to the schedule before us: "[O]ur determination [is] that the establishment of a fair and equitable schedule would be in the public interest

---

4. See, *e. g.*, Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 397, 60 S.Ct. 907, 84 L.Ed. 1263 (1940), Yakus v. United States, 321 U.S. 414, 420, 64 S. Ct. 660 (1944), and Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 607, (note 3), 70 S.Ct. 403, 94 L.Ed. 381 (1950).

under the Communications Act of 1934." The Communications Act, against which the purpose to be served by the delegation may be weighed, makes the present case distinguishable from Panama Refining, because it provides a general policy [4a] in the light of which the Commission can determine if and when, a fee schedule is needed.

Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947 (1935), does not apply. There the Court struck down the NIRA because Congress established no standards but sought to authorize the President to do so without any guidelines.

We see no merit in the contention that the agencies to whom the power is delegated should have been specified, because we think they were identified sufficiently to indicate the Congressional purpose. And we see no merit to the contention that § 140 was enacted as a rider to an appropriation bill in violation of the Legislative Reorganization Act of 1946, 60 Stat. 812, 821, and the Standing Rules of the House and Senate. The Act of 1946 adopted only as a Senate Rule a prohibition against amendments introducing new or general legislation to appropriation bills; § 140 was not an amendment. And despite the Senate and House rules, § 140 was adopted. Also despite criticisms from many sources, for varied reasons, since its adoption in 1952, § 140 has remained in effect.

We hold § 140 of Title V is not an unconstitutional grant of legislative power.

## II.

The claim is made that the Commission's schedule was drawn arbitrarily, or that the Commission exceeded the statutory authority or disregarded the statutory guidelines.

The schedule [5] itself was broken down into three categories: Broadcast Services, including AM, FM, and television broadcast stations, with fees for new stations ranging from $50.00 to $100.00,[6] Safety and Special Radio Services, including non-broadcast users of radios—other than common carriers, amateur aviation, marine and citizens—with application fees ranging from $4.00 to $30.00; [7] and Common Carrier Services, with fees ranging from $5.00 to $100.00.[8] There were several exclusions from the schedule, such as police, fire and other governmental users of radio; users on a non-profit basis essentially for public health, safety and welfare; and educational, hospital, disaster relief organizations and like users.

The Commission released its initial notice of rule making [9] and invited comments from those affected. It issued a Report and Order [10] adopting a schedule of fees, having made changes in the proposed fees in response to 900 formal comments, and many letters. Its Memorandum Opinion and Order October 7, 1963,[11] further modified the schedule in response to petitions for reconsideration. By inviting and considering the comments and petitions for reconsideration before putting the order into effect, the Commission fully complied with § 4(b) of the Administrative Procedure Act.[12]

4a. See e. g., 47 U.S.C. §§ 151, 303(g), (1962).

5. The fee schedule is published at 47 C.F.R. § 1.1101 et seq. (1964).

6. The fee for a three year television license is $100; for a radio license (AM and FM), $50.

7. The fee for a five year amateur radio license is $4; in the Citizens Radio Service, $10 and $8; for Fixed Microwave Radio Stations, $30.

8. The fee, for example, for Mobile Radio Service Base Stations is $100; and for a five year license in the Aviation Services, $10.

9. The notice of proposed rule making was issued February 16, 1962, and published at 27 Fed. Reg. 1729.

10. The Report and Order was issued May 8, 1962, and published at 28 Fed. Reg. 4658.

11. The Memorandum Opinion and Order are published at 28 Fed. Reg. 10911.

12. § 4(b) of the Administrative Procedure Act provides in pertinent part that "the agency shall afford interested per-

The point, that the fees scheduled are filing fees to be paid before any Commission service is rendered and that filing fees are unauthorized under § 140, was not raised before the Commission, and we therefore need not pass on it. Albertson v. FCC, 100 U.S.App.D.C. 103, 243 F.2d 209, 211 (1957); § 405 of the Communications Act of 1934, as amended, 47 U.S.C. § 405. We do not agree with petitioners that it is a jurisdictional point and that therefore it is irrelevant whether the point was raised below.

To sustain their contention that the schedule does not comply with the statutory guidelines as to the cost to government, value to the recipient, and public interest served, petitioners must show us that the order assailed is unreasonable or arbitrary: we are not at liberty to interfere with the discretion of the Commission. American Tel. & Tel. Co. v. United States, 299 U.S. 232, 236–237, 57 S.Ct. 170, 81 L.Ed. 142 (1936). The weighing of these statutory factors or "whether * * * all * * * must play a quantitative share" in the judgment made, was for the Commission. Secretary of Agriculture v. Central Refining Roig Co., 338 U.S. 604, 611, 612, 70 S.Ct. 403, 407 (1950).

Petitioners erroneously imply that the Commission had the *burden* of demonstrating that it took into consideration the "direct and indirect cost to the Government," as required by § 140. The burden is on petitioner to show unfairness. We think petitioners ask too much in claiming the identification of Commission function and costs with respect to each of the over 500,000 yearly applicants. The general terms are sufficient to inform applicants what services are rendered in considering applications for licenses for use of radio in the various categories. In its Report and Order in discussing Broadcast Services, the

Commission candidly conceded that "as flat fees, the charges do not accurately reflect cost * * * of processing a particular application or the value conferred upon the recipient." An AM operation in a town of 2,000 people, for example, would involve "complex interference questions requiring extensive processing," while an application for a large market VHF television facility could require little technical processing, although the income value to the licensee would be considerably more. We think this is a good illustration of the Commission's difficulty and sufficient answer to petitioners' contention that there is no rational basis, fairness, equity or uniformity, in charging the same fee for applications which require a hearing and for those which do not.

We think also the Commission's discussion and reasoning in its Report and Order under Safety and Special Radio Services is a complete answer to the contention that the Commission ignored the "value to the recipient" factor and did not attempt to demonstrate benefits to applicants nor relate fees to benefits. It seems quite obvious to us that in view of the number of applicants, petitioners are seeking a most unrealistic performance by the Commission and again erroneously imply that the burden is upon the Commission to justify its fee schedule.

Petitioners argue the Commission's failure to "perceive" that petitioners' licenses benefited primarily the public rather than the licensee, disregarded the "public interest served" factor. We refer again to the Commission's Report and Order under its heading "General" where the Commission weighed special benefit and public interest, and the effect on public interest of discouragement in use of radio because of fees. Further discussion of the problem is shown under Safety and Special Radio Services. And we

sons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after con-

sideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 1003(b).

think the care displayed in adjusting fees, after comments and objections from licensees, in the light of the "public interest" criterion compels the conclusion that there is no merit to petitioners' claims.

The Commission had to start somewhere in framing its schedule. It started with its 1961 cost study and has stated frankly that it must continue to study the schedule for unfairness or inequality.

Intervenor American Merchant Marine, Inc., argues that maritime users should be exempt from fees because their use of radios is required by law, or for services which are primarily in the public interest, and that because of the maritime industry's declining economic status, fee charges would be in conflict with the government policy of subsidizing the maritime industry and would render the status of non-subsidized ships more difficult. These same contentions were made before the Commission and rejected, but the Commission recognized the fact that "personal benefit * * * is derived from the operation of stations" and exempted only operations on a "non-profit" basis. These contentions go to the policy judgment of the Commission, and we have not been shown that this ruling was arbitrary.

The Commission, in response to a challenge by intervenor American Trucking Associations, submitted the affidavit of its chief budget officer with its brief.[13] The affidavit showed that in all categories the fees to be collected would be less than the cost of administering the particular service. The Associations, in reply, accept this conclusion but urge that since

the affidavit shows recovery by fees of 8% of the cost of administering the Broadcast Services, and 72% of the cost of administering the Safety and Special Radio Services, there is "a disproportion" which per se is "sufficient evidence of arbitrariness to justify * * * setting aside the Commission's decision." The self-sustaining principle is but one of the factors to be considered by the Commission in distributing the burden of costs, and there is no necessity that it be given the same weight in setting each class of fees. And the Associations' arguments comparing percentage of costs recovered are unimpressive considering the minimal fees to be paid by each individual member.

Finally we do not agree with intervenor American Radio Relay League that the imposition of fees upon amateur radio service is not within the authority of § 140 because many amateurs are engaged in "the official business of the Government" because some public service is rendered, and because an amateur radio license has no "value to the recipient." The Commission took the commendable public service into consideration in setting the nominal fee[14] and exempting novices and those amateurs who participate voluntarily in emergency communications networks. It also considered the possibility that a greater fee might discourage the use of radio by amateurs, and set the fee at a minimum so as not to interfere with the purpose of the Communications Act[15] to encourage and enlarge the use of radio by amateurs in the public interest. And we see no requirement in § 140 that "value to the recipient" need be pecuniary

---

13. The Associations complain that this affidavit was "new material" not considered by the Commission in setting the schedule. However, in their brief the Associations stated: "If the Commission had any evidence for its conclusion that ' * * * the total fees to be collected bear a fair relationship to the cost of administering the Safety and Special Radio Services,' it has not supplied it." (Brief of Intervenor American Trucking Associations, Inc., at p. 19). The Commission accepted this implied invitation.

14. For initial licenses and renewals, for five years, the fee is $4.00—for a modification of an amateur license, $2.00. A $20.00 fee is charged for special amateur call signs.

15. 47 U.S.C. § 303(g) provides that the Commission shall "generally encourage the larger and more effective use of radio in the public interest."

value. That is but one of the factors that the Commission had to take into account, and as we have indicated before, the Commission may in its discretion determine what weight should be placed on each of the factors.

We affirm the Commission's order since we think no showing has been made that § 140 is unconstitutional or that the Commission's action was arbitrary or lacking authority, or that the Commission exceeded its authority or disregarded guidelines.

Petition to set aside order denied.