CLAY BROADCASTING CORPORA-TION OF TEXAS, Petitioner,

v.

UNITED STATES of America and Federal Communications Commission, Respondents.

NATIONAL ASSOCIATION OF BROAD-CASTERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents.

Nos. 71–1621, 71–1990.

United States Court of Appeals, Fifth Circuit.

July 21, 1972.

Rehearing Denied Oct. 2, 1972.

Frank U. Fletcher, Vincent J. Curtis, Jr., Washington, D. C., Gibbons Burke, New Orleans, La., Robert L. Heald, Washington, D. C. (Fletcher, Heald, Rowell, Kenehan & Hildreth, Washington, D. C., of counsel), for Clay Broadcasting Corp. of Texas.

John B. Summers, Louise O. Knight, Washington, D. C., for National Assn. of Broadcasters.

John N. Mitchell, Atty. Gen., Richard W. McLaren, Asst. Atty. Gen., Dept. of Justice, John H. Conlin, Associate Gen. Counsel, John W. Pettit, Gen. Counsel, F.C.C., Gregory B. Hovendon, Asst. Chief, Appellate Section, Dept. of Jus-
tice, Washington, D. C., Charles M. Firestone, Edward J. Kuhlmann, and Kenneth A. Cox, F.C.C., Washington, D. C., for appellees.

Gary L. Christensen, Charles S. Walsh, Washington, D. C., for intervenor, Nat'l Cable T.V. Assn.

Thomas N. Frohack, James R. Cooke, Washington, D. C., for intervenor, Forward Communications Corp.

Alfred C. Cordon and John B. Jacob, Washington, D. C. (Cordon & Jacob, Washington, D. C., of counsel), for WBLI, Inc., and others.

Walter Kaitz, Castro Valley, Cal., for intervenor, Cal. Community T.V. Assn., Inc.

Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

These consolidated petitions for review seek to set aside the revised schedule of fees of the Federal Communications Commission which became effective August 1, 1970.[1] The petitioners are representatives of the broadcasting and cable television industries and include several individuals and corporations which have interests in particular broadcast properties. While the contentions of the several parties vary widely the petitioners collectively present a broad challenge to the Commission's authority and the reasonableness of its order imposing the fees adopted July 1, 1970, Schedule of Fees, 23 F.C.C.2d 880, 35 Fed.Reg. 10988. Upon review we find that the revised fee schedule is a reasonable exercise of the authority delegated to the Commission by Congress.

The concept of user charges was explicitly authorized by Congress in Title V of the Independent Offices Appropriation Act of 1952.[2] The Federal Com-

---

1. This Court has jurisdiction to review the Commission's order under 47 U.S.C. § 402(a) and 5 U.S.C. § 701 et seq.

2. "It is the sense of the Congress that any work, service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certifi-
cate, registration, or similar thing of value or utility performed, furnished, provided, granted, prepared, or issued by any Federal agency (including wholly owned Government corporations as defined in the Government Corporation Control Act of 1945) to or for any per-

munications Commission adopted its first fee schedule in 1963 covering all areas of Commission regulation at the time. Report and Order, Fees, 34 F.C.C. 811 (1963). That schedule was challenged before the Seventh Circuit Court of Appeals, which affirmed the Commission's order, Aeronautical Radio, Inc. v. United States, 335 F.2d 304 (7th Cir. 1964), cert. denied, 379 U.S. 966, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965). Shortly thereafter the Commission announced a policy of keeping its fees schedule under continuing review. See Fees, 1 F.C.C.2d 1349 (1965).

On February 18, 1970, the Commission issued a Notice of Proposed Rule Making looking towards the broad revision of its fee schedule. Schedule of Fees, Docket No. 18802, 21 F.C.C.2d 502, 35 Fed.Reg. 3815 (1970). The Commission noted that Congress had urged that the activities of the Commission become more nearly self-sustaining and proposed a new schedule of fees which would generate estimated fees approximating the Commission's budgetary request for fiscal year 1971. These fees included increases in those areas which were already subject to at least nominal fees and proposed new fees in areas where the Commission had only recently exercised jurisdiction to regulate—community antenna television (CATV) and radio frequency equipment testing and approval.

In addition to levying application fees, the Commission proposed to give explicit recognition to the "value to the recipient" of the privileges granted, as well as the public interest served and the direct and indirect cost to the Government by imposing fees relating to the value of the authorization of the license.[3] The Commission proposed fees for the grant of applications for assignment of a license or a transfer of interest in a broadcast station which reflected the value which the parties to the transaction placed on the sale. It also proposed an annual fee for broadcast stations based on the licensees' own commercial rates. In the CATV field the Commission proposed to tie the annual fee to the number of subscribers in each system.

After receiving a large number of comments from interested parties, the Commission adopted the revised Schedule of Fees on July 1, 1970. The document was officially released on July 2, 1970, Schedule of Fees, 23 F.C.C.2d 880, and was printed in the July 8, 1970 issue of the Federal Register, 35 Fed.Reg. 10988. As indicated in the earlier No-

sons (including groups, associations, organizations, partnerships, corporations, or businesses), except those engaged in the transaction of official business of the Government shall be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation (which, in the case of agencies in the executive branch, shall be as uniform as practicable and subject to such policies as the President may prescribe) to prescribe therefore such fee, charge, or price, if any, as he shall determine, in case none exists, or redetermine, in case of an existing one, to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy, or interest served, and other pertinent facts, and any amount so determined or redetermined shall be collected and paid into the Treasury as miscellaneous receipts . . ." 31 U.S.C. § 483a (1971).

3. " . . . [T]he proposed fees are designed to make the Commission '* * * self-sustaining to the full extent possible * * *' in the work and services it performs in the granting of licenses, authorizations, privileges, benefits, and similar things of value. Moreover, the rationale for the formulation of the new fee schedule gives explicit recognition, in appropriately varying degrees, to the 'value to the recipient' of the privileges granted, as well as the public interest served and the direct and indirect cost to the Government. Therefore, in addition to a continuation of the existing concept of a fee upon filing of an application seeking an authorization, the new fee schedule adopts the concept of a separate fee reflecting our consideration of the 'value to the recipient' factor involved in authorizations and licenses." 21 F.C.C.2d at 503–04 (1970).

tice of Proposed Rule Making[4] the revision abolished broadcast license renewal fees in favor of annual operating fees which amounted to 24 times a radio station's highest one-minute spot announcement rate, but not less than $52, and 12 times a television station's highest 30-second spot announcement rate, but not less than $144. The assignment and transfer fee to be paid immediately following the consummation of the transfer was set at 2% of the consideration paid. The new schedule was to be effective August 1, 1970 on all grants made on or after that date. The Commission however excepted from the grant fees those applications filed prior to July 1, 1970, the date of the adoption of the new schedule. The Commission levied an annual fee on CATV systems equal to $0.30 multiplied by the number of subscribers of the system.

Thereafter a number of petitions for reconsideration were filed with the Commission concerning various aspects of its fee schedule. These petitions, in so far as they are material to this case, were subsequently denied, 28 F.C.C.2d 139 (1971). All petitions for review of the Commission's fee schedule rulings, filed pursuant to 47 U.S.C. § 402(a) in this and other circuits, have been transferred to this court and consolidated in this case. We consider each of the challenged fees in turn.

## I. *Broadcast Annual License Fee*

The National Association of Broadcasters (NAB), a national trade organization with a substantial number of radio and television station members, seeks a review of both the annual license fee and the 2% grant fee on assignment and transfer applications. The NAB contends that the annual fee is in effect a discriminatory tax on radio and television. It acknowledges that the Commission may impose fees upon the broadcast services and that the Commission is not limited to the imposition of nominal fees only. However the NAB

contends this annual license fee is unreasonable because it reflects that the Commission's concern was only with recovering the full amount of the agency's appropriation. This, it contends, violates the statutory guidelines provided in the act which authorizes agency fees[5] that are "fair and equitable" taking into account: (1) the cost to the Government; (2) the value to the recipient; and (3) the public policy or interest served. It argues that not all of the Commission's activities in the broadcast section are of specific benefit to the stations. The Commission and the stations themselves expend a significant amount of time and effort in activities which serve the general public at large. But the NAB complains, "the fact is the schedule of fees for the broadcast services hands to commercial licensees *all* of the costs of commission activities in the broadcast field when in fact all of the services are *not* rendered for the benefit of commercial licensees."

 In our judgment the NAB misconstrues the legal requirements which the Commission must meet in imposing fees and we believe that its position demonstrates a myopic misconception of the "benefits" which the Commission confers on commercial licensees. In the first instance, the weighing of these statutory factors or "whether * * * all * * * must play a quantitative share" in the judgment made, was for the Commission. Aeronautical Radio, Inc. v. United States, 335 F.2d 304, 309 (7th Cir. 1964) citing Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 611, 612, 70 S.Ct. 403, 407, 94 L.Ed. 381, 388, 389 (1950). Additionally Bureau of the Budget Circular A–25 which provides "The maximum fee for a special service will be governed by its total cost and not by the value of the service to the recipient" does not compel the Commission to precisely pro-rate its costs in performing the various services in the Broadcast Bureau and limit the fee for

---

4. 21 F.C.C.2d at 507 (1970).

5. 31 U.S.C. § 483a. *See* note 2 *supra.*

each service to its precise administrative cost.[6] Indeed such precision would be difficult if not altogether impossible to achieve.[7]

The record indicates that the Commission estimated the direct and indirect costs of regulating the broadcast industry to be $9,661,200 or 38.8% of the Commission's fiscal year 1971 budget. 23 F.C.C.2d at 882. After giving consideration to the other factors,[8] the Commission settled on a schedule in which the broadcast fees were estimated to produce $9,600,000. That figure represented less than 0.3% of the approximately $3.5 billion gross revenues generated by the broadcast industry in 1968. In exchange, commercial licensees receive an exclusive right to operate for a profit on a portion of the public's electro-magnetic spectrum. The Commission regulation of the broadcast industry generally provides individual licensees with continuing protection from technical interference as is consistent with the public interest and maintains the market structure which makes it possible for commercial broadcasting to operate at a profit. We therefore are unable to find that the Commission acted unreasonably or arbitrarily in imposing on commercial licensees an annual fee which is part of a schedule calculated to fully recover the direct and indirect costs of regulating the broadcast industry.[9]

## II. Two Percent Grant Fee

The NAB and a number of individuals with particular broadcast interests [10] also challenge the imposition of a

---

6. We find no merit in the NAB's contention that these fees are in reality an unlawful tax because the money involved is not approximately equal to the *amount of work* rendered by the Commission in behalf of the party against whom the charge is made. The Commission is clearly entitled to charge such fees to recover its costs as are fair considering the value to the recipient, public policy and other pertinent facts. 31 U.S.C.. § 483a. By the very terms of the statute "value to the recipient" is not limited to the amount of work performed but also includes any " . . . service, publication, report, document, benefit, privilege, authority, use, franchise, license, permit, certificate, registration, or other similar thing of value or utility . . . " *Id.*

7. E. g., processing an application for increase in a station's power would appear to be a cost properly chargeable to both the applying station for expansion of its signal contour, and to those stations which might receive interference from the power increase for the protection of their signal contours.

8. I. e., the "value to the recipient" and "public policy" factors. 23 F.C.C.2d at 882.

9. We also find no merit to the NAB's contention that the Commission's fees are improper because they fail to take into consideration the large number of unprofitable stations. In the response to the petitions for reconsideration the Commission noted:

"The Commission is keenly aware of the significant number of unprofitable broadcast stations and of the contention that the annual operating fees would cause a diminution of program services by broadcast stations, particularly in the marginal and unprofitable stations. We would emphasize, however, that no evidence has been submitted in support of these assertions, and that since all broadcast licensees have established financial qualifications sufficient to carry on their broadcast operations, it is highly unlikely that the new fee schedule would constitute a significant burden in a broadcast station's total operation. * * * The Commission will, of course, maintain a continuing review in this area, and if the facts indicate a change is necessary, appropriate revisions will be made. Meanwhile, any broadcast licensee whose financial situation is such that the annual operating fees will cause a diminution of program service to the public, or otherwise materially affect his operation, may petition the Commission for a waiver of the annual operating fee for a given period, and show good cause for relief requested." 28 F.C.C.2d 143 (1971).

10. Clay Broadcasting Corporation of Texas; WBLI, Inc.; Dorothy Meythaler, Executrix of the Estate [Last Will and Testament] of Merlin J. Meythaler and Merton J. Gonstead d/b/a Livingston County Broadcasting Company and Dorothy Meythaler and Merton J. Gonstead d/b/a Pontiac FM Broadcasting Company; Steuben Broadcasters, Inc.; Forward Communications Corporation.

fee of 2% of the consideration paid following consummation of the assignment of a license or transfer of control as approved by the Commission. 23 F.C.C.2d at 903. We find no merit to the NAB's contention that the 2% figure is arbitrary or unfair because it does not precisely reflect the different amounts of effort the Commission expends in considering the applications of varying complexity.[11] Furthermore, we are unable to accept its argument that the amount paid solely reflects the transferors' assets and good will, or its inference that the Commission has already been compensated by the fee paid when the application for transfer was filed for any work performed for the transferee.

In transferring the license the Commission is granting to the transferee a privilege similar to the grant of a construction permit for a new station. In considering the value of the transfer the Commission noted "unlike construction permits, which often involve competitive applications and comparative hearings and which simply authorize a new station of undetermined profitability, assignments of license and transfers of control are insulated from competition and concern a going business whose profitability is reflected in a judgment by the parties who have reached agreement on the price to be paid." 21 F.C.C.2d at 506–07. Given this explicit consideration of the "value of the benefit conferred" with the cost to the government and public policy involved we are not persuaded that a grant fee measured by 2% of the consideration paid is unreasonable.

A more serious question is presented by the individual petitioners with respect to the time schedule adopted by the Commission for the institution of these grant fees. In the schedule the Commission set an "effective" date of August 1, 1970, after which the grant fees would be imposed. However the Commission exempted from this fee those ap-plications granted after August 1, 1970 but which were filed with the Commission prior to July 1, 1970. Two of the individual petitioners, Meythaler and Steuben, filed applications on July 1 and 2, 1970, but prior to the public announcement that the new fee schedule had been adopted and that it would apply to the grant of their applications. Essentially they contend that they relied on the prior fee schedule in negotiating their contracts and that the new rule has the effect of retroactively applying the grant fee to them.

The remaining petitioners, Clay, Forward and WBLI, all filed applications for transfer or assignment during July 1970 but after the Commission had published the new schedule. These petitioners contend that notwithstanding the Commission's assignment of August 1, 1970 as the "effective" date, the real "impact" date was July 1, 1970. They therefore argue: (1) the commission erred in distinguishing the filing date from the "effective" date; (2) the Commission violated the Administrative Procedure Act [12] and its own rules [13] in providing no notice or less than 30 days notice prior to the "effective" date of the rule; and (3) that once the Commission decided to afford an exemption for some applications on file prior to the effective date it could not lawfully exclude July filed applications from this exception. Although we might well have done otherwise if the question was ours to decide in the first instance, we can not find that the Commission's chosen "effective" date and its exemption are arbitrary, unreasonable or unlawful.

▆ Despite arguments to the contrary we are not convinced that the grant fee is being applied retroactively to applications filed in July. The fee is not automatically imposed on all filed applications for assignment or transfer. The 2% fee is charged only after the Commission has processed the application and decided to grant the transfer

---

11. See f. n. 6, *supra*.

12. 5 U.S.C. § 553(d) (1971).

13. 47 C.F.R. § 1.427 (1971).

or assignment. Even then the fee is not required unless and until the consummation of the assignment because of the uncertainties of the date of closing and other factors.[14] The closing of the transfer or assignment following Commission approval is an event of sufficient independence from the mere filing of the application that the imposition of a fee upon transfers to be made in the future is not a retroactive fee upon those applications already on file but not yet granted. Thus we are unable to conclude that the Commission acted arbitrarily in using the date of grant for the "effective" date of the fee instead of the date of filing. *See* Buckeye Cablevision, Inc. v. F.C.C., 128 U.S.App. D.C. 262, 387 F.2d 220, 227 (1967).

■ In the Commission's Report and Order adopting the new fees it stated that the fees were being made "effective" on August 1, 1970, although it was aware that 30 days' official notice by publication in the Federal Register was not possible.[15] The Commission noted that it believed that good cause existed for an August 1, 1970, effective date citing three factors: (1) wide-spread notice in fact would be provided affected parties; (2) a first of the month effective date was required for administrative pro-ration of yearly fees; and (3) that in accordance with Congressional directives the Commission wanted the fee schedule to cover as much of fiscal 1971 as reasonably possible. We find that the Commission's statement of "good cause" sufficiently meets the requirements of both the Administrative Procedure Act and the Commission's rules. *See* Buckeye Cablevision, Inc., 128 U.S.App.D.C. 262, 387 F.2d at 228 n. 34; *cf.* Pent-R-Books, Inc. v. United States Postal Service, 328 F.Supp. 297, 312 (E.D.N.Y.1971).

■ We are also not convinced that the Commission either was required to include or was unreasonable in excluding July filed applications for transfer or assignment from the exception to the grant fee afforded applications filed prior to July 1, 1970. There is something arbitrary about the drawing of any administrative line. To some extent whether a line appears to be "reasonable" to a party depends upon which side of the line the party falls. The difficulty in drawing fair and reasonable lines in the communication industries is considerably exacerbated by the rapid technical and economic expansion of the various media. *E. g.*, Buckeye Cablevision, Inc. v. F.C.C., 128 U.S.App. D.C. 262, 387 F.2d 220 (1967) ['Grandfather clause' permitted systems carrying distant signals before the regulations were announced to continue to do so]; Kessler v. F.C.C., 117 U.S.App.D.C. 130, 326 F.2d 673 (1963) ['Freeze' on new station applications effective when announced although applications then on file would be processed].

In the present case the Communications Act has a built in 30 day holding period on applications for assignment or transfer before the Commission may grant them.[16] In excepting those applications already on file by July 1, 1970, the Commission excluded from the grant fee those applications which it had the authority to grant prior to the August 1, 1970 effective date of the fee.

■ In response to criticism following the adoption of the fees the Commission noted that it had established this exception in order to eliminate any claim that action on matters filed prior to the date of adoption of the new fee schedule might be delayed until on or after August 1, 1970, so as to be able to exact the new grant fees. 28 F.C.C. 139, 141 (1971). The Commission also noted that no claim of surprise as to the adoption of the new fee schedule can properly be made, since the notice of proposed rule making had been issued in February 1970, $4\frac{1}{2}$ months prior to July, 1970, and since the Commission's representations to the Congress that a new fee

---

14. 23 F.C.C.2d at 888.

15. 23 F.C.C.2d at 885.

16. 47 U.S.C. § 309(b) (1971).

schedule would be adopted by the beginning of fiscal year 1971 had been widely reported. *Id.* As in *Kessler*, "The issue is not what we might have done ourselves or what we might think would have been more reasonable. The issue is whether what the Commission did, in the light of the reasons it gave, was unreasonable and capricious." 117 U.S. App.D.C. 130, 326 F.2d at 686. Here, as in *Kessler*, we cannot conclude that it was.

### III. Annual Fee for CATV

 The National Cable Television Association, Inc. (NCTA) and the California Community Television Association jointly challenge the portion of the Commission's fee schedule which imposes an annual fee of $.30 per subscriber on all CATV systems. NCTA contends that the Commission lacks the authority to impose any sort of an annual fee in cable television, and that in any event this annual fee fails to meet the statutory requirements [17] and amounts to a tax because it fails to consider the statutory element of "value to the recipient" (i. e., the CATV operators) conferred by the FCC regulation of the industry. Finally NCTA asserts that the fees charged CATV operators are based upon a miscalculation of the actual costs of regulating CATV and that the fees are disproportionately higher for CATV

than for other regulated industries. We find no merit in any of these contentions.

The Commission's efforts to regulate CATV have not been consistent.[18] The new technology which made cable television possible was thought at first to fall wholly between the cracks of the Commission's statutory authority,[19] but in recent years the Commission has asserted an increasingly expansive jurisdiction over cable TV. The potential economic impact of CATV technology on other broadcast media spawned the initial regulatory efforts by the FCC.[20] This collateral impact on other regulated media has been used to justify the Commission's "ancillary" regulation of CATV. United States v. Southwestern Cable Co., 392 U.S. 157, 178, 88 S.Ct. 1994, 20 L.Ed.2d 1001, 1016 (1968).[21] In General Telephone Co. of Southwest v. United States, 449 F.2d 846 (5th Cir. 1971) we upheld the Commission's rules which prohibited telephone companies from furnishing CATV services in their telephone service areas and restricted their construction of cable facilities. Although the question in that case was whether the Commission had properly exercised its unquestioned authority over common carriers,[22] we recognized that the development of CATV is part of the broader purpose of the Commission under 47 U.S.C. § 151.[23] 449 F.2d at 854.

17. 31 U.S.C. § 483a (1971).

18. United States v. Southwestern Cable Co. 392 U.S. at 161 to 167, 88 S.Ct. 1994, 20 L.Ed.2d at 1007 to 1010. *See also,* Note, The Wire Mire: The FCC and CATV, 79 Harv.L.Rev. 366 (1965).

19. *See,* 1959 Report and Order, 26 F.C.C. 403, 426–31.

20. Carter Mountain Transmission Corp. v. F.C.C., 32 F.C.C. 459 (1962) aff'd, 116 U.S.App.D.C. 93, 321 F.2d 359 (D.C.Cir 1963), cert. denied 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963).

21. The Court stated: "There is no need here to determine in detail the limits of the Commission's authority to regulate CATV. It is enough to emphasize that the authority which we recognize today under § 152(a) is restricted to that reasonably ancillary to the effective per-

formance of the Commission's various responsibilities for the regulation of television broadcasting . . . We express no views as to the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes." 392 U.S. at 178, 88 S.Ct. at 2005, 20 L.Ed.2d at 1016.

22. 47 U.S.C. § 214 (1971).

23. "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient Nation-wide, and world-wide wire and radio communication service with adequate *facilities at reasonable charges,* . . . there is created a commission to be known as the 'Federal Communications Commission' . . ." 47 U. S.C. § 151 (1971).

Most recently the Supreme Court in United States v. Midwest Video Corp., 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), has held that the Commission has jurisdiction under 47 U.S.C. § 152(a) over CATV systems and operations which may be exercised to protect and promote the objectives for which the Commission had been assigned jurisdiction over broadcasting. 406 U.S. at 667, 92 S.Ct. at 1870, 32 L.Ed.2d at 403. The court upheld the Commission's authority to require that CATV systems with more than 3,500 subscribers operate to a significant extent as a local outlet by originating programing and make available facilities for local programing.

█ It seems apparent to this court that under the Commission's regulatory scheme which existed from the time of the adoption of these fees until the present, CATV operators have received "valuable benefits" sufficient to justify the imposition of the annual fee. Although the Commission does not issue licenses for CATV systems as it does for broadcast stations, CATV operators have directly benefited from the Commission's various regulations designed to keep entry into the industry open.[24] The Commission has also proposed rules limiting the amount of franchise fees which local governments could charge cable operators.[25] Indeed, as the Commission points out, the entire regulation of cable television is undergoing radical change, much of which clearly inures to the benefit of cable operators.[26]

█ It is true that some of the Commission's direct regulation of CATV has tended to restrict cable development in order to protect other media.[27] But the inquiry under 31 U.S.C. 483a is not whether the regulated industry likes or agrees with all the regulations prescribed, but whether the members of the industry have benefited in a manner different from the public at large from the regulatory scheme provided by the Commission. CATV operators in effect merchandise the broadcast signals which the Commission has authorized by its regulation. The scarcity of television outlets which exists under the Commission's regulation of the broadcast market structure creates much of the economic value of the distant signal importation by CATV. It is therefore clear the CATV operators do receive benefits of real value from the Commission's regulation of CATV and the related broadcast media.

█ We have already observed in Section I of this opinion that the statutory factors of benefit, costs and policy are for the Commission to weigh. *Aeronautical Radio, Inc.*, supra. In this instance the Commission observed:

"47. The 30-cents-per-subscriber-annual-fee formula has been been attacked on diverse grounds: that it fails to take into consideration that different systems charge different subscription rates; that operating costs vary even when subscription rates are the same; that in some cases local franchise agreements bar systems from passing increased costs on to subscribers via rate increases; and that the 30-cents-per subscriber fee would cut sharply into narrow profit margins.

48. The very diversity of these criticisms (which were not accompa-

24. *See* General Telephone Company of the Southwest v. United States, 449 F.2d 846 (5th Cir. 1971) [in which NCTA intervened in support of the Commission's regulations]. The Commission has restricted television broadcast station and translator station ownership of CATV systems in their service area, 23 F.C.C.2d 816 (1970), prohibited broadcast network ownership of cable systems, 23 F.C.C.2d 816 (1970), and proposed rules banning cross-ownership of newspapers and cable systems in the same area, 23 F.C.C.2d 833 (1970).

25. Notice of Proposed Rule Making, CATV, Docket No. 18892, 25 F.C.C.2d 50, 53 (1970).

26. Cable Television Proposals, 31 F.C.C.2d 115 (1971).

27. E. g., Buckeye Cablevision, Inc. v. United States, 438 F.2d 948 (6th Cir. 1971).

nied by specific supporting data) suggests that it would be exceedingly difficult to devise a formula that would be proof against all attack. In defense of the formula adopted, we would note: (i) that generally available information about the CATV industry indicates that subscription rates tend to cluster at about $5 per month or a bit higher; (ii) that 30 cents per subscriber per year appears to constitute in the typical case only one-half of 1 percent of CATV system gross revenues from subscription fees, if that much; (iii) that, particularly in view of the smallness of the fee, alternative formulas involving more complicated calculation to verify adequacy of fee payment might be more precise but, under the circumstances, are unnecessary; (iv) that the Commission lacks reliable information about the operations and internal finances of CATV systems, but is currently readying new rules and procedures which will enable it to obtain such information, via annual, reporting by CATV systems; and finally, (v) that as the Commission obtains such information it will use it for periodic review of the equity of its CATV fee schedule."

23 F.C.C. at 897–88 (1970).

The Commission's formulation clearly evidences consideration of the benefits to CATV systems as measured by the number of subscribers, the direct and indirect costs of the Commission's efforts to regulate the industry, and the Congressional policy that the Commission make its work of specific benefit "self-sustaining to the full extent possible," under 31 U.S.C. 483a. Considering all factors revealed by the record the balance which the Commission struck was not unreasonable or arbitrary in our opinion. If experience shows that the Commission's fees are unfair, unworkable or have an adverse effect on competition in the CATV industry the Commission can be expected to revise them in order to meet the exigencies of the competitive situation. General Telephone Company of the Southwest v.

United States, 449 F.2d 846, 858 (5th Cir. 1971).

For the reasons stated we find that the Commission did not exceed or abuse its statutory authority in imposing the fees contained in its July 1, 1970, Report and Order. The order of the Commission is in all respects affirmed.